## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Eastern District of New York (the "USAO-EDNY") (collectively, the "United States") and the Defendant Gunvor S.A. ("Gunvor" or the "Company"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to Gunvor. Gunvor hereby agrees and stipulates that the following information is true and accurate. Gunvor admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the criminal Information filed in connection with this Agreement:

I.  Relevant Entities and Individuals

   A.  The Defendant and Its Employees

   1.  Gunvor was a Swiss-based energy trading company with affiliates and subsidiaries around the world, including trading offices in the United States, Singapore and the Bahamas. Gunvor was a subsidiary of Gunvor Group Ltd., a multinational energy commodities trading company registered in Cyprus.

   2.  Gunvor Singapore PTE Ltd. ("Gunvor Singapore") was a company affiliated with Gunvor. Gunvor Singapore was a subsidiary of Gunvor Group Ltd. Gunvor Singapore was an "agent" of Gunvor, as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3(a) in, among other things, buying and

selling oil products obtained by State-Owned Entity #1 and State-Owned Entity #2 through contracts with Petroecuador.

3. Gunvor (Bahamas) Ltd. ("Gunvor Bahamas") was a company affiliated with Gunvor. Gunvor Bahamas was a subsidiary of Gunvor Group Ltd. Gunvor Bahamas was an "agent" of Gunvor, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a) in, among other things, buying and selling oil products obtained by State-Owned Entity #1 and State-Owned Entity #2 through contracts with Petroecuador.

4. Raymond Kohut ("Kohut") was a citizen of Canada who worked in business development for Gunvor. From approximately 2011 to September 2018, Kohut was an employee of Gunvor Bahamas and other Gunvor affiliates while performing work for and on behalf of Gunvor. From approximately October 2018 to August 2020, Kohut worked with Gunvor as a third-party consultant and agent for the Company. Kohut was an "employee" and "agent" of Gunvor, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

5. Gunvor Manager #1, an individual whose identity is known to the United States and the Company, was a citizen of Spain and a resident of Switzerland. Between in or about and between July 2011 and May 2014, Gunvor Manager #1 was a crude oil trader at Gunvor S.A. In or about and between June 2014 and March 2017, when Gunvor Manager #1 left the Company, Gunvor Manager #1 was a Managing Director at Gunvor Bahamas and Kohut's supervisor. Gunvor Manager #1 was an "employee" and "agent" of Gunvor, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

6. Gunvor Manager #2, an individual whose identity is known to the United States and the Company, was a citizen of Spain and a resident of Switzerland. In or about and between 2011 and 2018, Gunvor Manager #2 served in senior managerial roles in Gunvor's crude

oil department, and, at various times, Gunvor Singapore and Gunvor Bahamas. Guvnor Manager #2, who left the Company in August 2019, was an "employee" and "agent" of Gunvor, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

B.   State-Owned Entities and Government Officials

7.   Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador. Petroecuador was wholly owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of a foreign government, and Petroecuador's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

8.   Nilsen Arias Sandoval ("Arias") was a citizen of Ecuador and a senior manager at Petroecuador in or about and between 2010 and May 2017. Arias was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

9.   Ecuadorian Official #1, an individual whose identity is known to the United States and the Company, was a citizen of Ecuador and a senior manager at Petroecuador in or about and between 2017 and 2020. Ecuadorian Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

10.   Ecuadorian Official #2, an individual whose identity is known to the United States and the Company, was a citizen of Ecuador and held various high-level positions in the Ecuadorian Ministry of Hydrocarbons and the Ecuadorian Ministry of Energy in or about and between 2013 and 2020. Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

11. Ecuadorian Official #3, an individual whose identity is known to the United States and the Company, was a citizen of Ecuador and held high-level positions in the Ecuadorian government from in or about and between 1997 and 2019. Ecuadorian Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

12. Ecuadorian Official #4, an individual whose identity is known to the United States and the Company, was a citizen of Ecuador and an executive-level employee of Petroecuador during the relevant time period. Ecuadorian Official #4 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

13. State-Owned Entity #1, an entity the identity of which is known to the United States and the Company, was a state-owned and state-controlled energy trading company based in Asia.

14. State-Owned Entity #2, an entity the identity of which is known to the United States and the Company, was a state-owned and state-controlled energy trading company based in Asia.

C. <u>Intermediaries and Shell Companies</u>

15. Antonio Pere Ycaza ("Antonio Pere") was a citizen of Ecuador, Spain and the United States who resided in Miami, Florida. Between approximately October 2012 and May 2020, Antonio Pere, along with his brother Enrique Pere Ycaza, was a consultant for Gunvor who exercised control over companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian government officials in order to, among other things, obtain and retain business for Gunvor. Antonio Pere was an "agent" of Gunvor, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

16. Enrique Pere Ycaza ("Enrique Pere") was a citizen of Ecuador and Spain. Enrique Pere, together with Antonio Pere, provided consulting services to Gunvor, incorporated consulting businesses and opened bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials. Enrique Pere was an "agent" of Gunvor, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

17. Energy Intelligence & Consulting Corp. ("EIC") was a shell company formed in Panama by Antonio Pere and Enrique Pere. EIC was used to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Gunvor and other companies.

18. Oil Intelligence Corp. ("OIC") was a shell company formed in the British Virgin Islands by Antonio Pere and Enrique Pere. OIC was used to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Gunvor and other companies.

19. Ecuadorian Intermediary, an individual whose identity is known to the United States and the Company, was a citizen of Ecuador and served as an intermediary who facilitated bribe payments between Antonio Pere and Enrique Pere and Ecuadorian officials, on behalf of Gunvor and other companies.

II. The Bribery Scheme

    A. Overview

20. In or about and between 2012 and 2020, Gunvor, through Kohut, Gunvor Manager #1, and Gunvor Manager #2, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, Ecuadorian officials to secure improper advantages in order to obtain and retain business from Petroecuador in connection with the

A-5

purchase and sale of oil products through contracts between Petroecuador and State-Owned Entity #1 and between Petroecuador and State-Owned Entity #2.

21. In furtherance of the scheme, Gunvor, through Gunvor Singapore, paid more than $97 million to Antonio Pere and Enrique Pere via their companies EIC and OIC. Gunvor, acting through its employees Kohut, Gunvor Manager #1 and Gunvor Manager #2, and its agents, knew and intended that a portion of the payments be used to bribe Ecuadorian officials. In turn, Antonio Pere and Enrique Pere made millions of dollars in bribe payments on Gunvor's behalf to Ecuadorian officials, including, directly and indirectly, to Arias, Ecuadorian Official #1, Ecuadorian Official #2, Ecuadorian Official #3, Ecuadorian Official #4 and others.

22. In furtherance of the scheme, Antonio Pere and Enrique Pere set up shell companies for the purpose of laundering Gunvor's corrupt payments, entered into several services agreements to facilitate the payment of bribes, created fake invoices for purported consulting services and used email accounts with pseudonyms to transfer funds to offshore shell companies involved in the conspiracy. The illegal payments were made through multiple bank accounts in the United States and abroad in an effort to conceal the bribes.

23. Gunvor and its affiliate companies earned more than $384 million in profits from the business Gunvor corruptly obtained related to Petroecuador during the relevant time period.

B. Origins of the Scheme

24. In or by 2011, Gunvor and its co-conspirators learned that Petroecuador had developed a program of oil-backed loans, through which state-owned entities provided loans to Petroecuador secured by oil products to be delivered over a period of years. Since the counterparties to these contracts were foreign governments, Petroecuador did not require a

competitive bidding process to award the contracts. In turn, private trading companies entered into separate but related agreements with the state-owned entities to market, sell and transport the oil products delivered pursuant to the state-owned entities' contracts with Petroecuador. As such, private trading companies effectively assumed the position of the state-owned entities in the contracts with Petroecuador.

25. In or around 2011, Kohut met with Antonio Pere at Antonio Pere's business office in Miami, Florida to discuss potential business for Gunvor with Petroecuador.

26. After the meeting in Miami, in or around 2011, Kohut introduced Antonio Pere to Kohut's supervisor, Gunvor Manager #1. Gunvor Manager #1, Antonio Pere, and Kohut discussed a potential partnership between Gunvor and State-Owned Entity #1 to secure business in connection with Petroecuador and agreed that Antonio Pere would work with Petroecuador official Arias to get State-Owned Entity #1 added to the roster of state-owned entities that were permitted to enter into oil-backed loan agreements with Petroecuador.

27. By partnering with a state-owned entity, Gunvor could benefit from the state-owned entity's relationship with Petroecuador. Gunvor would enter into separate but related agreements with the state-owned entity to pre-finance, market, transport and sell the oil products delivered pursuant to the state-owned entity's contract with Petroecuador. This would allow Gunvor to obtain oil products through a streamlined process that was otherwise not available to private entities like the Company.

28. In or around 2011, Antonio Pere met with Arias in Quito, Ecuador and offered to pay bribes on Gunvor's behalf in exchange for Arias's assistance obtaining contracts for State-Owned Entity #1 with Petroecuador. Arias agreed, knowing that the oil products sold by Petroecuador to State-Owned Entity #1 would ultimately be marketed by Gunvor.

C. <u>2012-2017</u>

29. In or around 2012, State-Owned Entity #1 entered into contracts with Petroecuador through which State-Owned Entity #1 provided loans, financed by Gunvor, to Petroecuador secured by oil products to be delivered over a period of years. State-Owned Entity #1 and Petroecuador amended or renewed the contracts at various times during the relevant period.

30. In or around the same time period, Gunvor entered into a back-to-back agreement with State-Owned Entity #1 to market the oil products delivered pursuant to the contracts between State-Owned Entity #1 and Petroecuador.

31. In or around the same time period, Gunvor Singapore entered into a services agreement with Antonio Pere and Enrique Pere, through EIC, which enabled the payment of bribes to Ecuadorian officials on Gunvor's behalf. The agreement provided for certain prepayments and success fees, but the bulk of the compensation was through per-barrel "volume fee" payments to EIC that depended on the amount of oil purchased by State-Owned Entity #1 in connection with the oil-backed loan contract. Gunvor and EIC amended the services agreement several times to change, among other things, the amount of the volume fees due to be paid to EIC. Antonio Pere and Enrique Pere used portions of the volume fees to pay bribes to Ecuadorian officials, including Arias, on Gunvor's behalf. At times, Gunvor Manager #1, subject to Gunvor Manager #2's approval, negotiated on Gunvor's behalf directly with Antonio Pere.

32. In or around 2015, Gunvor expanded the scheme to include State-Owned Entity #2. Just as with State-Owned Entity #1, State-Owned Entity #2, financed by Gunvor, was awarded contracts with Petroecuador, and Gunvor entered into a back-to-back agreement with State-Owned Entity #2 to market and sell the oil products delivered pursuant to the contracts between State-Owned Entity #2 and Petroecuador. These contracts were negotiated with

A-8

assistance from Gunvor and its employees and agents. In connection with negotiating these contracts, Kohut and Gunvor Manger #2 met with Arias in Bangkok, Thailand to obtain information about the status of the contract negotiations between Petroecuador and State-Owned Entity #2. With Gunvor's agreement, State-Owned Entity #2 and Petroecuador amended or renewed the contracts at various times during the relevant period.

33. In or around 2015, Gunvor and Antonio Pere and Enrique Pere, through EIC, updated their services agreement to include per-barrel payments related to oil products delivered pursuant to oil-backed loan agreements to State-Owned Entity #2. As they did in connection with State-Owned Entity #1, Antonio Pere and Enrique Pere used portions of the volume fees to pay bribes to Ecuadorian officials on Gunvor's behalf.

34. In or around 2017, Antonio Pere and Enrique Pere, acting as Gunvor's agents, replaced EIC with OIC as the shell company through which Gunvor paid bribes to Ecuadorian officials. The terms of Gunvor's services agreement with OIC were substantially similar to the terms of Gunvor's services agreement with EIC, including the requirement of a "volume fee" to be paid on each barrel of oil products delivered to State-Owned Entity #1 and State-Owned Entity #2.

35. Pursuant to the scheme, EIC and later OIC submitted invoices to Gunvor Singapore for payment of fees pursuant to Gunvor's services agreements with EIC and OIC, and in connection with specific cargoes of oil products purchased by State-Owned Entity #1 and State-Owned Entity #2 in connection with their oil-backed loans to Petroecuador. Antonio Pere and Enrique Pere submitted the invoices by email to Gunvor while they were located in the United States and elsewhere.

36. EIC and OIC emailed the invoices to the attention of Kohut, who coordinated their processing and payment, and sent them for review and approval to, among others, Gunvor Manager #1 and Gunvor Manager #2. Each of the invoices contained wire transfer instructions to EIC and OIC bank accounts outside the United States with correspondent bank accounts that were located in the United States, including in New York City.

37. Antonio Pere and Enrique Pere, through EIC and OIC and with Gunvor's knowledge, then caused a portion of the payments to be wired to bank accounts held for the benefit of Ecuadorian officials.

38. In exchange for the bribes, Arias, Ecuadorian Official #1, Ecuadorian Official #2 and other foreign officials provided, and agreed to provide, improper advantages to Gunvor including: (a) helping to direct Petroecuador to award contracts to State-Owned Entity #1 and State-Owned Entity #2 for the ultimate benefit of Gunvor; and (b) providing Gunvor, through certain of its employees and agents, information about Petroecuador that assisted Gunvor in corruptly obtaining and retaining business for Gunvor in connection with Petroecuador.

39. In or around and between 2012 and 2019, Gunvor, acting through its agents Antonio Pere and Enrique Pere, paid Arias millions of dollars in bribes through payments from EIC and OIC. For example:

(a) On or about May 14, 2013, Gunvor Singapore caused approximately $281,000 to be wired from its bank account in Singapore, through correspondent bank accounts located in the United States, to a bank account in Switzerland held in the name of EIC.

(b) On or about August 25, 2014, Gunvor Singapore caused approximately $686,000 to be wired from its bank account in Singapore, through correspondent

A-10

bank accounts located in the United States, to a bank account in Switzerland held in the name of EIC.

    (c) On or about August 31, 2017, Antonio Pere and Enrique Pere caused approximately $980,000 to be wired from a shell company bank account in the British Virgin Islands, through correspondent bank accounts located in the United States, to a bank account in Portugal held for the benefit of Arias.

    (d) On or about February 7, 2018, Antonio Pere and Enrique Pere caused approximately $400,000 to be wired from a shell company bank account in the British Virgin Islands, through correspondent bank accounts located in the United States, to a bank account in Portugal held for the benefit of Arias.

    40. Arias subsequently shared portions of the bribes received from Gunvor with other Ecuadorian officials, including Ecuadorian Official #3 and Ecuadorian Official #4.

    41. In addition, in or around 2014, after executing a contract pertinent to Gunvor's business related to Petroecuador, Antonio Pere, at Gunvor Manager #1's direction, bought Arias an 18-karat gold Patek Philippe timepiece worth approximately $38,000 in exchange for Arias's assistance with approval of the contract and for providing confidential Petroecuador information to Gunvor.

    42. In or around 2017, Arias left Petroecuador. Notwithstanding Arias's departure, Antonio Pere and Enrique Pere, acting as Gunvor's agents, continued to pay him bribes through 2019 based on the corrupt arrangement formed at the time Arias was an official at Petroecuador.

D.     2017-2020

43.    Following Arias's departure from Petroecuador, Gunvor and its co-conspirators adopted a new method to effectuate the bribery scheme.  Beginning in or around 2017, Gunvor, through Antonio Pere and Enrique Pere, began paying bribes to Ecuadorian Official #1, Ecuadorian Official #2, and various other officials within Petroecuador who provided confidential Petroecuador information to Gunvor.

44.    In or around the second half of 2017, Antonio Pere met with Ecuadorian Official #2 and Ecuadorian Intermediary in Coral Gables, Florida.  At that meeting, Antonio Pere discussed the scheme with Ecuadorian Official #2, including how to effectuate bribe payments on Gunvor's behalf in exchange for confidential Petroecuador information about shipping windows.  Ecuadorian Official #2 agreed to participate in the scheme and directed Antonio Pere to communicate through Ecuadorian Intermediary.

45.    To facilitate this phase of the scheme, Gunvor continued to pay fees to Antonio Pere and Enrique Pere, via OIC, on each barrel of oil products purchased by State-Owned Entity #1 and State-Owned Entity #2 in connection with their oil-backed loan contracts with Petroecuador.  As in the prior phase of the scheme, Kohut, with the approval of Gunvor Manager #2, continued to coordinate processing and payment of the invoices by Gunvor.

46.    Upon receiving funds from Gunvor, Antonio Pere and Enrique Pere wired money to intermediaries based in Ecuador, including Ecuador Intermediary who then arranged for the bribes to be delivered, often in cash, to Ecuadorian Official #1, Ecuadorian Official #2 and various lower-level officials within Petroecuador who provided confidential Petroecuador information to Gunvor.  For example, on or about June 27, 2019, Antonio Pere and Enrique Pere

caused approximately $142,927 to be wired from an EIC bank account in the Cayman Islands to a bank account in Panama held in the name of Ecuador Intermediary.

47. In furtherance of the scheme, in or around April 2018, Kohut, Gunvor Manager #2, Antonio Pere and Enrique Pere met in Coral Gables, Florida to discuss contracts for which bribes would be paid.

48. Gunvor's payments, made via its agents Antonio Pere and Enrique Pere, to Ecuadorian Official #1, Ecuadorian Official #2 and other Petroecuador officials continued until in or around 2020. In total, Ecuadorian Official #1, Ecuadorian Official #2 and the other Petroecuador officials received approximately $1.7 million in bribes on behalf of Gunvor.

E.  Efforts to Conceal the Bribery Scheme

49. Throughout the scheme, the co-conspirators undertook efforts to conceal the nature of their communications. For example, from the inception of the bribery scheme, Gunvor Manager #1 instructed Kohut to communicate using personal email accounts. Kohut complied with Gunvor Manager #1's instruction, and Gunvor Manager #1, as well as Antonio Pere and Enrique Pere, also used personal or pseudonymous email accounts to communicate about the scheme. In addition, in their email communications regarding the scheme, Kohut, Antonio Pere and Gunvor Manager #1 often referred to co-conspirators by aliases rather than their actual names. For example:

(a) On or about October 16, 2012, Antonio Pere sent an email from an alias email account to the personal email accounts of Gunvor Manager #1 and Kohut. The email contained correspondence between Arias and representatives of State-Owned Entity #1 regarding the oil product delivery windows Petroecuador was offering State-Owned Entity #1.

(b)     On or about November 3, 2014, Antonio Pere sent an email from an alias email account to the personal email accounts of Gunvor Manager #1 and Kohut. An attachment to the email provided language for correspondence to be sent by State-Owned Entity #2 to Arias in order to "have the green light and start a process of direct and fluid communication." Gunvor Manager #1 forwarded the message to Gunvor Manager #2's business email account.

(c)     On or about January 20, 2015, Kohut, using his personal email account, emailed Antonio Pere and Enrique Pere at their alias email accounts requesting internal Petroecuador information from Arias, whom Kohut referred to using an alias.

(d)     On or about April 23, 2015, Antonio Pere and Gunvor Manager #1 exchanged messages via WhatsApp regarding confidential loading and shipping window information received through bribes paid to Ecuadorian officials. This information allowed Gunvor to further its corrupt scheme by planning, in a financially efficient way, its marketing of oil products received pursuant to the oil-backed loan agreements with State-Owned Entity #1 and State-Owned Entity #2.

50.     Gunvor Manager #1 and Gunvor Manager #2 took steps to avoid explicit mention of bribery. For instance, during a meeting in Miami, Florida with Antonio Pere, Gunvor Manager #1 said, in sum and substance, that Gunvor Manager #1 did not want to know about payments Antonio Pere was making to Ecuadorian officials.

51.     Similarly, during a video call from the offices of Gunvor Bahamas in or around 2017, Gunvor Manager #2 instructed Antonio Pere to avoid speaking about bribery, saying, in sum and substance, that Gunvor Manager #2 did not want to hear anything about it.

52.     By in or about January 2018, Gunvor executives and compliance personnel were aware that Gunvor had paid Antonio Pere and Enrique Pere tens of millions of dollars

pursuant to the Company's services agreements with EIC and OIC, without having received other supporting documentation for EIC's or OIC's business activities on Gunvor's behalf.  Between in or about May 2018 and in or about May 2020, Gunvor executives and compliance personnel made requests to Antonio Pere and Enrique Pere (i) for supporting documentation to justify the commission payments and (ii) to meet with executives and compliance personnel.  Antonio Pere and Enrique Pere failed repeatedly to provide complete responses to Gunvor's documentary requests and would not travel to Gunvor's headquarters for the requested meeting.  Notwithstanding these repeated failures, Gunvor continued to make corrupt payments to entities owned and controlled by Antonio Pere and Enrique Pere until approximately January 2020, at which time Gunvor suspended payments to OIC.  Gunvor terminated its services agreement with OIC in or around May 2020.